Morning, Your Honor. Morning. It is the Court, Philip Cherney, on behalf of Mr. Hall, here this morning. This case arrives here as a result of a district court decision, memorandum decision, 84 pages, filed in March of 2003. One of the most extensive I've read in quite a while. Yes, it is. And, of course, I'd like to focus on the ineffective assistance of counsel issue, which the majority of that decision is devoted to, and recognizing that I must show some clearly erroneous findings by the Court. I would submit to the Court that the first and probably most critical erroneous finding by Magistrate Judge Snyder is that she refers to the fact in, as being fact, that the court did not communicate any information to Ducot, who's the trial attorney, before the return of the jury's verdict. That indicated that he was in church, and that's clearly erroneous. You know, you look at the record, counsel, and it looks like your client improved his story considerably after the verdict. And it was then that he begins to say, oh, yeah, I was in church longer, that I couldn't possibly have gotten to Bakersfield. And what the mother told Ducos was, well, we got out of church around 10 o'clock. Well, you know, I think one of the things that strikes me about this case is if you look back the three weeks after the trial, when my client is complaining to the trial judge, your Honor, my attorney didn't do anything for me. And the court allows him an opportunity to express himself, and he does, and I won't read that to you, but he does describe the Lancaster, the social welfare, being in church with his mother, and so forth. And the Dunes Motel, he mentions. And then the court says to trial counsel, is there anything you would like to put on the record? And he says, no, I'll submit it. And the court says, well, why don't you just make sure that everything that is in your position is completely recorded? And Mr. Ducos says, your Honor, we discussed the matter of alibi witnesses, and it was my feeling in discussing the matter with him, considering all factors that the distance involved would not preclude anything from the trial. Now, in explaining why he wouldn't call these other witnesses, instead of putting his client, a convicted felon – But wait a minute, wait a minute. Is the defendant present in that context? In this context here? Yes. Right here? Yes. Standing right there. Standing there? I'm sorry, before the trial, when Mr. Ducos just said what you just said? Yes. And does he say, wait a minute, my alibi witnesses will put me in a position where I could never have been in the same place at the same time? Because, in fact, as the magistrate judge said after all of this reviewing, yes, yes, he may have been with those folks, but the driving distance does not preclude both events happening concurrently – sequentially, rather. So that the whole issue, as I understand it, is being in church at 10 o'clock in the morning in Little Rock does not preclude hopping in the car, getting on the freeway, and whether it's an hour and a half or two and a half hours, getting up to commit the robbery. Well, I don't dispute that at all. Okay, so why did not – you're citing this having been raised by Mr. Hall early on, but unless I'm missing something, why wouldn't he have challenged his attorney right at that point in saying, well, these witnesses will say I couldn't have committed the robbery? Well, first of all, he testified at the trial, at his own trial. But when is this hearing – when is what you're – This is three weeks after trial. That this is all going on? Yes. Okay. And Mr. Hall is complaining to the trial judge that my attorney didn't do anything. He didn't contact the witnesses. He didn't call them. You know, essentially, he was put in a position of testifying to something that was uncorroborated by his defense counsel because he felt desperate to get up there and do something because his attorney had not done anything. And if you read the testimony of Mr. Hall, I mean, it reads like – and I don't use this term lightly. You know, he's slightly retarded. If you read his testimony, he is at a loss when he's asked by his own attorney, who completely unprepared, completely unprepared, when he asks him, how long does it take to drive from Lancaster? Why would counsel even ask that question? When the defendant says, well, I don't drive, I don't have a license, I've never been to Bakersfield in my life, is his response, Your Honor, if we get back – Pretty good answer. Wasn't that a pretty good answer to that question? Well, not when you're trying to – I don't think so. When defense counsel is asking the question, defense counsel is assuming that there must be some discrepancy in the time. If it were 10 o'clock, I would agree with you, Your Honor. However, what Ducos says here, which I think is critical to the trial judge, is he says, after evaluating all matters, now I'm quoting, I considered that the best approach would be for Mr. Hall to take the stand and say that I was – that he was not there. I did not feel that considering these alibi witnesses could not produce what I considered an airtight alibi, that is, that they could have testified to him, being where he saw them, that still would not necessarily prove that there was a possibility that it might be detrimental. I didn't see that it would be beneficial to the extent that it was necessary to call the witnesses. Now, frankly, I have no idea what that means. Well, the magistrate judge who heard it, or at least reviewed this, resolved it, as I understand it. I may be wrong, but my understanding is what she concluded was there was information communicated to Ducos that he was – Hall was with his mother at church at 10 o'clock, and that there was nothing that alerted him that Hall was still in Little Rock as late as 2 o'clock in the afternoon, or whatever the time was in the afternoon at church, and thereafter was what was at issue. So that what he was attempting to say, I think the magistrate judge concluded, was that unless he had an alibi witness who could keep him in Little Rock to foreclose driving to Bakersfield, it wasn't very helpful to put them on. And he was pretty adamant about saying that during the evidentiary hearing. Now, I understand you may think he's a liar or whatever, I don't know, but I'm sitting here trying to look at the record and sort all this out and say, well, where's the gap? Where's the problem? Right. I'm sort of being rhetorical. Let me be direct. What in the record shows that Ducos knew or should have known through alibi witnesses that Hall was in Little Rock at a time when he could not possibly have gotten to Bakersfield? Well, you know, I pointed this out. I didn't send an investigator on a wild goose chase, and I know the attorney general didn't either. We both sent investigators out to drive the distance, because everyone assumed that he had been in church within, give or take, a half an hour, hour or so. So everyone assumed that it had been in the afternoon, that she goes to church at 11 o'clock in the morning, religiously, and they were there until 1.30 or so. So we all assumed that that was the case. It was only after there was testimony of the evidentiary hearing that there's a morning service as well. And lo and behold, Mr. Ducos, whose memory is terrible in all other respects, says, Oh, I recall 10 years before I had a conversation with my client's mother, and she said, It must have been 10 o'clock in the morning. Well, you know, it's difficult for me to accept this lawyer's credibility. I can look back three weeks after trial. I can look back at my client's testimony where he says, I was in church, in trial. I was in church with my mother until 2 or 3 o'clock in the afternoon. And that's what Mr. Ducos is saying. And if I may say this, I cannot rationally ñ I have never seen that you have to have an ironclad alibi. If we had an ironclad alibi, a videotape of somebody in a store when supposedly they're committing an act someplace else, but we don't ñ we rarely have that. Alibi defenses don't have to be ironclad. Indeed, I can't imagine under ñ That I accept. I understand that. But ñ How do you put your ñ Even if you put those witnesses on, they wouldn't account for the ability of him to get from point A to point B in time. Therefore, all they are doing at best is creating some question as to whether he could have and did actually drive fast enough to close the gap. Are you arguing something different that ñ No, I don't think so, Your Honor. I respectfully disagree. I think a reasonable doubt is what the defense is ñ what we're doing. Because if a jury heard this evidence, as the magistrate heard it, in my view, this is reasonable evidence that a jury could have returned a different verdict on if they had heard these people. Now, listen, counsel. The Ducos did talk with the mother. Yes. And what did she tell him? Well, you know, it depends on who you believe. Surely if she had said ñ this is back at the relevant time when she should have remembered ñ if she'd said, well, we went to church and we were there until, well, at least 2 o'clock, he would have put her on the stand. But apparently what she said was 10 o'clock.  She says he didn't do it. She says, I talked to him. He asked me how much the fee was. I told him. And he never followed up on the investigation, which the client says I told him to talk to my mother. The defendant said, talk to my mother. She's got the witnesses. And if ñ just to follow through, then ñ if he had talked to the mother and she said 10 o'clock and he had done the investigation, what? Well ñ What would he have uncovered that the record reflects? Well, assuming that it's 10 o'clock in the morning and that he was released, that he was out of church at 10 o'clock in the morning, then we are stuck in an untenable position. He could say, I'm not going to do any more research, any more investigation. But the tenor of what I see as his responses to the court was that he claims that he decided that the approach to this is to put the defendant on the witness stand to testify to the very things that he would have ñ if he had done a thorough investigation, he would have put those witnesses on the witness stand, because I cannot see how it could be competent under any circumstance to put a thrice-convicted robber on the witness stand to testify to the very things that other people could say. But, see, you probably had extensive experience in the courts. And I think what he's saying here, when he says it might be detrimental, it used to be sort of a rule of thumb that the fastest way to convict a defendant was to blow up the alibi, because I heard jurors say many times, you may have two. We weren't sure. But when we heard those alibi witnesses lie, then they visit the failures of the alibi witness on the defendant. It's very dangerous to put on a bad alibi. But, you see, they hold it against the defendant. And if a clever prosecutor can use it to prove that he could have been where the witnesses said, because he wasn't where the alibi claimed he was. Your Honor. Alibi stuff is very dangerous. And the kind of alibi that they always talk about in seminars is the old mother-at-church alibi. I mean, that's a tuna fish sandwich for the trial lawyers. You know, I couldn't agree with you more. But the irony is ñ And that's what he says when it's detrimental. That's what he means by hair-tight alibi. You put on a bad alibi, and it can go off in your face like an atomic bomb. And that's exactly what he does. That's my point. That's the irony, is the defense is alibi. He puts the defendant on the witness stand to say ñ And then you put the mom on and everybody else, and they all have different stories, and the whole thing goes up in smoke. So he decides, rightly or wrongly, and I'm not giving this guy an A-plus for defense, but then your alibi ends up helping the prosecution. We don't know whether that would have happened. But it seems that this lawyer had something that generally falls within the accepted scope of dealing with this kind of evidence. It wasn't hair-tight. Well, I put the mom from church on, and now we're in real trouble. This guy was in big trouble no matter what he did. Well, you know ñ I'm still trying to understand. Yes. Because I don't know what went through this guy's mind other than what's on the record. And at least what I'm taking away, as the magistrate judge did, is that even if he had made the investigation, and I would agree that a lawyer needs to do the investigation so he can make an informed strategic decision. I'm still trying to understand, if he had made the ñ followed up, what would he have discovered that he could have put on? An alibi that kept him in Little Rock to the point where he could not possibly have driven, or an alibi that would have narrowed the gap of time so it would have been a question of whether he could have made it in time. First, I don't see as there would be any need to put on Mr. Hall. No, that's not my question. My question is, what is the alibi evidence in lieu of Mr. Hall? That would have proved what? That he was in Little Rock at a time when the deal was going down, or that he was there long enough that he would have had to drive Lickety-Split to make it? Which of those two scenarios? I'm confused. Well, I think that the prior fact would have had before it evidence of, A, that he was in Little Rock until approximately ñ if they believed his mother, he stayed with her and had ñ they ate some dinner afterwards. They had Marquita Walker, who was someone who had seen Waymond at church at the time, and she knew it was in the afternoon. They would have had Shirley Jackson, a choice to make. She's convicted also of felony, whether to put her on or not. No need to put Mr. Hall on. And he would have established ñ and Reverend Hearns ñ And they would have established what? They would have established that it was the afternoon, or, you know, there may have been some variation. Not conclusive that he couldn't have gotten to Bakersfield, but casting doubt on it. Absolutely. Thank you. That's all I was trying to get. Casting doubt. And that's why, if he had done this confidently, he would have had an investigator drive the distance so that if it had been 2 o'clock, then it would have taken an hour and a half, an hour and 37 minutes by the prosecution's, the government's estimation, a little over two hours by my investigator's driving. And so it would have cast doubt, yes, upon his presence at the scene of the robbery. All right. And we haven't touched upon the question of the social welfare, which we do have a hit, if you will, from the computer. Okay. And again, in that case, if he put on the evidence that he was at the welfare office, that puts him in a position where he couldn't have been. Correct. Or doubtful of whether he could have been. That's right. No, no, that's my question. Which is that he couldn't have been there, couldn't have been two places at the same time, or to have gotten up to do the second robbery, he would have had to, again, drive lickety-slack. Yeah. He could not have been at the welfare department and been at a robbery because the appointment was at 9 a.m. The robbery occurred at 8 a.m. All right. To get from Bakersfield to this place. Okay. So that's a, you know, that's like your camera in the. . . No, I disagree, Your Honor. I respectfully disagree. I don't think. . . I thought that's to your advantage. It's like having. . . You're saying if you put on the welfare guy, you said, yeah, or they could have found him. Yes. If he was here, then that's as good as saying he wasn't, he couldn't be there. The problem is, though, of course, juries can disregard that evidence and believe that the eyewitnesses are right and that this is the guy. There's no doubt. But in their minds, however, that's why I think the standard that we're looking at is for competent counsel to make a strategic decision to put the defendant on the stand. In lieu of the other evidence, I believe. . . I understand what you're saying. I'm trying to understand the factual. . . Yes. . . . end result of being incompetent. Right. And I think the end result is that while I can't. . . And I would be. . . I would be reluctant to say that there's an ironclad or airtight alibi which I don't think is required at all. Otherwise, I would hope that the State would decide not to prosecute. But we don't usually have that. And that's why I see this as his statements early on to the trial judge are such that they strike me based upon what the defendant actually testified to as being. . . He didn't say to that trial judge. . . You know, I talked to his mother. I talked to Marquis Walker. I talked to these other people. I did some. . . I talked to Reverend Hearns to find out the times. I read the record. All right. Thank you. Thank you. If I may reserve a moment to reply. Sure. Thank you. May it please the Court. My name is Catherine Tennant, and I'm representing the appellee in this case. As counsel has noted and as the Court's also noticed, this was really a highly litigated case. At the very beginning when Mr. Hall made these allegations, we didn't really know a lot. But since that time, the records become a lot more clear, and we've been able to figure out a lot more about what happened. Both Mr. Turney and myself spent a lot of time examining each of these alibi witnesses. We also spent a lot of time examining Mrs. Hall. And then also Mr. Hall, Wayman Hall, took the stand and testified as well. And really what the end result of all that litigation was, was that this was really a case where the reasonableness of Mr. Duco's actions are largely determined by the information that he had at the time. And what we found out by looking at the record was that this was a situation where Mr. Hall was on the eve of trial. He had had two different attorneys. His most recent attorney was all ready to go. At that point in time, he had heard about Mr. Duco, heard that he was a good attorney. So Mr. Hall was able to get a hold of him, and he said, hey, I'd like you to represent me. I hear you're good. At that point, Mr. Duco was up against a problem here because the trial judge was ready to go, and he wasn't thrilled that Mr. Hall was seeking new counsel at the last minute. So Mr. Duco comes in. He says, I'll come in only if I can get a continuance. So he has about a month to work with. And then what information did he get from his client? And that's where it's really frustrating because it looks like Mr. Hall said, hey, call my mom. Find out from her what happened. And in interviewing Mrs. Hall, who, by the way, is just a wonderful, sweet woman, it became very clear that she really was in no position to testify at that point in time. She testified at the evidentiary hearing that she was extremely ill at that time. She was suffering from a heart condition. And she really didn't know a lot about what was going on. She was very far removed from the case. And, you know, I think the district court found, the magistrate found, that Mr. Duco did call her and say, hey, you know, what time were you in church? You know, were you in church that day? That's one thing that's been consistent throughout this whole record is Mr. Duco's position that he always had information that if Mr. Hall was indeed in church, it was early enough that he could have been at both places. But I think the other thing that really came out, though, and sometimes in cases like this where we have so many years that go by after the record, sometimes the very best evidence is to go back and see, well, what kind of things were written at the time of the event. And to me what really stands out in this case is Ada Hall wrote a letter to the court after her son was convicted, and this was in March of 1992. He had gone to trial in January. And she wrote a letter, and she's complaining about, why aren't these other co-defendants tried with my son at the same time? And she also says to the court, you know, I've tried to supply this information that my son's asked for, you know, for instance, his hotel that he was living in or the church, and also the welfare office. And she says, you know, I tried to keep track of that. She says, I wasn't really aware of any dates that he was at church. But she's really upset that these other co-defendants weren't tried at the same time. She's infuriated that, why weren't these other guys at trial? And I think what really comes out to me from this letter is, if indeed her son had been with her on the afternoon of the crime that took place in Bakersfield, this Payless Shoe Store robbery, I believe it was 11th of November, if her son had been with her that afternoon, 3 o'clock, 3.30, watching a football game and eating fried chicken, that would have come out in this letter. And she would have said, hey, you know, Your Honor, he was with me. I couldn't come to court. I was ill. I couldn't be there. But he was there. Instead, what came out of the evidentiary hearing was that Mrs. Hall actually wasn't really clear on these dates in November of 1990, because that was, you know, what, 14 months earlier. And it was Wayman Hall that supplied her with the information. He said, Mom, you know, it was on the 11th of November, remember? We were in church together. That's what came out was that she really did not have this independent knowledge before she talked to her son, and he's the one that had supplied her with this. And then as we interviewed the witnesses more, it became very apparent that the other alibi witnesses, this Marquetta Walker and Shirley Jackson, they had not been in contact with Ada Hall until quite a ways, quite a bit of time had passed between the actual robbery. And I think a point that also needs to be made here is that, you know, Mr. Turney's been pretty harsh on this defense attorney, Mr. Duco, because he didn't want to put on alibi witnesses. But let me tell you, these alibi witnesses wouldn't have helped Mr. Hall's case. For one thing, I think maybe Hall's best defense was that, hey, I wear glasses, you know, and I can't even see. And here these people are saying that I committed these robberies without glasses. Well, both Shirley Jackson and Marquetta Walker didn't recall Mr. Hall wearing glasses. I mean, that's one of his key defenses is that, hey, I can't even function without glasses. They both had differing recollections about what he was wearing. They remembered different things about the church. But to me, the most important reason why these alibi witnesses would not have been good ones was because Shirley Jackson was married to Roy Jackson, who was arrested at the same robbery in Lancaster, just about a week after Mr. Hall's second robbery. So we have a string of three robberies taking place in November of 1990, and here you're going to put on an alibi witness whose husband was arrested at the same time in the third robbery. To me, that just kind of highlights the fact that, hey, you know, this is very suspect, this testimony that would be coming in. The other thing that really hasn't been brought out but I think needs to be brought out is that, you know, the robbery evidence was strong, but I think that the strongest evidence of guilt in this case was the fact that we have co-defendant Daniels in both robbery number one, robbery number two, and then he's arrested in Lancaster with Mr. Hall. And at trial, Mr. Hall said. Mr. Hall just met him ten minutes before he was arrested. Exactly. That, to me, yeah. I think, you know, right then and there the case was lost because that is so incredible and that just makes no sense and it's just, you know, it's not chance that these guys are not in Little Rock together, they're in Bakersfield together committing robberies. Well, you've got some pretty strong findings of fact. Ada Hall's testimony, not credited. Shirley Jackson's testimony, not credited. Marquetta Walker's testimony, not credited. And there's plenty of substantiation for that earlier in this lengthy opinion. I agree. I think this is one case where the court can feel comfortable that we really explored all the different reasons that Mr. Duco did not put these people on. And, you know, I can testify that it was a lengthy evidentiary hearing that went into pretty much every crevice was explored in this case. And, you know, I believe that the findings should be upheld of Magistrate Snyder that Mr. Duco was not incompetent, but he made a reasonable decision based on the facts that he had at the time. Thank you. Thank you, Counsel. You may respond. Thank you, Your Honor. I was going to say, knowing Magistrate Judge Snyder, as I do, and seeing the two of you, that must have been a very interesting and high energy and very good hearing that you all went through. Well, she was very complimentary of the two of us. Perhaps we were too collegial. But, you know, I did file objections to the statements of fact, and she disregarded those. I couldn't disagree more, and I'm very disappointed. But that's my personal feelings are not relevant. But making credibility calls about these people, I wouldn't have hesitated. But the problem is that, again, is going back to the time of the trial, the information that he had, and just to specifically reply, you know, that same letter that Mrs. Hall wrote, you know, she's 70 years old at the time, 10 years later when we're having the hearing, and she's still ill, has medical problems. But, you know, we found a way to get her before Judge Snyder so that she could see and hear her. But, you know, this is not, and I think that's so critical here, is when you read the testimony of Mr. Hall, it's pathetic because he's not articulate. He says things in a way that, you know, when the prosecutor is now asking him, well, where is Reverend Hearns? And he says, I don't know. He asks him how to spell his name. I don't know how to spell his name. I wouldn't have an idea how to spell it, but he's listed. I think he'd have a position other than at church. But what's your point? Accepting what you're saying is true, what's your point? My point is to judge this case as if Mr. Hall is an intelligent individual that his mother has every detail down, I think is unfair, a characterization of how we would put on this case, put on these witnesses. And she said in her letter, in addition to the trial judge, I have given the lawyer the welfare office in Lancaster, the Dunes Motel in Lancaster where he lived, and First Missionary Baptist Church where he and I attended on Sunday. So that aspect of it, I just want to point out. Astropia, as I understand it, the way this is coming out is a little different than I think what was meant. He testifies, I have a dead eye. The correction may help with vision, but he has a noticeable eye that eyewitnesses who said, I looked into his eyes and didn't notice that, that would have been a point to argue. It was never argued. Finally, I said at the beginning of my opening that Shirley Jackson, you know, he doesn't have to call Shirley Jackson. She's a convicted felon. She's got an association with a prior different robbery regarding my client. He doesn't have to call her to testify. If they've got Marquita Walker and Ada Hall, both of whom, character evidence was introduced. They're both law-abiding people. So in any event, I agree that we had a fair and full evidentiary hearing before Magistrate Judge Snyder and appreciate that. However, I disagree with those findings that she's made and submit it to the court. Thank you both. Thank you very much. The case is well handled. The case is ordered to submit. It will be in recess until tomorrow morning at nine o'clock. Thank you. Thank you. Thank you.
judges: B. Fletcher,trott, Fisher